**WHITEHALL MANOR, INC. and Linden 515, LP, Appellants**

v.

**The PLANNING COMMISSION OF The CITY OF ALLENTOWN, City of Allentown, Allentown Neighborhood Improvement Zone Development Authority, and Allentown Commercial and Industrial Development Authority.**

Commonwealth Court of Pennsylvania.

Argued Sept. 13, 2013.
Decided Oct. 30, 2013.

722

John A. Van Luvanee, Doylestown, for appellants.

Frances A. Fruhwirth, Allentown, for appellees City of Allentown and The Planning Commission of The City of Allentown.

Timothy J. Siegfried, Allentown, for appellees Allentown Commercial and Industrial Development Authority and Allentown Neighborhood Improvement Zone Development Authority.

BEFORE: SIMPSON, Judge, LEAVITT, Judge, and McCULLOUGH, Judge.

OPINION BY Judge SIMPSON.

In this land use appeal, Whitehall Manor, Inc. (Whitehall Manor) and Linden 515, LP (Linden 515) (collectively, Objectors) ask whether the Court of Common Pleas of Lehigh County (trial court) erred in affirming a decision of the City of Allentown Planning Commission (Commission) that granted conditional approval of the preliminary and final land development plans submitted by the Allentown Commercial and Industrial Development Authority (Applicant).[1] The land development plans contemplate development of, among other things, an arena and events center in downtown Allentown.

Objectors challenge the trial court's determination that they lacked standing to appeal the Commission's conditional approval of the land development plans. They also contend the Commission erred or abused its discretion in approving the plans. For the reasons that follow, we conclude the trial court erred in determining Objectors lacked standing to appeal the Commission's decision. However, we affirm the trial court's determination that no error is apparent in the Commission's conditional approval of Applicant's plans.

## I. Background

Whitehall Manor has a leasehold interest in a parcel located at 12 North Seventh Street, Allentown. Linden 515 is the owner of real property located at 515 Linden Street, Allentown. Abraham Atiyeh is the

1. Applicant notes that the Appellee here is actually the Allentown Neighborhood Improvement Zone Development Authority. To that end, Applicant points out that the land development plans at issue here were submitted by the Allentown Commercial and Industrial Development Authority. On October 2, 2012, after the approval of the plans by the Planning Commission, all property comprising the project was conveyed by deed to

the Allentown Neighborhood Improvement Zone Development Authority, which thereby succeeded the Allentown Commercial and Industrial Development Authority as the developer. Before the trial court, Applicant filed a praecipe to substitute the Allentown Neighborhood Improvement Zone Development Authority for the Allentown Commercial and Industrial Development Authority. Certified Record, Item # 17.

principal of both Whitehall Manor and Linden 515.

Applicant is a corporate body organized pursuant to Article XVI–B of the Fiscal Code,[2] with its primary place of business located at 435 Hamilton Street, Allentown.

In February 2012, Applicant submitted an application and preliminary and final land development plans to the City of Allentown Bureau of Planning and Zoning. The plans proposed development of an arena, a hotel, offices and a parking facility on a 5.34–acre, one city block area of downtown Allentown. Thereafter, the City's Director of Planning, Bureau of Planning and Zoning, issued two review letters, containing comments on engineering, planning, traffic, parks, and zoning.

About a month later, the Commission held a public meeting on Applicant's development plans. During the meeting, Objectors' representative attended and voiced opposition to the development plans. At the close of the meeting, the Commission voted to approve Applicant's preliminary and final land development plans, subject to certain conditions. The next day, the Commission's conditional approval was confirmed by letter. Objectors filed a land use appeal with the trial court.

Through their appeal, Objectors asserted that the Commission did not adhere to the law and abused its discretion. Objectors raised numerous issues in support of their appeal. The City and Applicant intervened in opposition to Objectors' appeal.

Without taking additional evidence, the trial court affirmed the Commission's conditional approval of the preliminary and

final land development plans. The trial court first determined Objectors lacked standing to appeal the Commission's decision. Specifically, the trial court stated, based on the record developed before the Commission, there was no evidence that Objectors' properties would be aggrieved by the implementation of the development plans. Further, Objectors had the opportunity to develop a record before the trial court regarding their claims of aggrievement, yet failed to do so.

The trial court also rejected Objectors' assertion that Applicant waived its right to challenge Objectors' standing. The trial court stated that Objectors were not granted party status before the Commission. Rather, Objectors' representative merely attended the Commission's meeting and voiced his concerns about the development plans. Because the meeting was open to the public and because Objectors' representative made no effort to join Objectors as parties to the proceedings before the Commission, the trial court stated it would be "nonsensical" for Applicant or the Commission to raise a standing challenge at the meeting. Tr. Ct., Slip Op., 12/14/12, at 7. "There is no requirement in law that [Applicant] raise a standing challenge against [Objectors] before the Commission as a prerequisite to raising a standing challenge on appeal." *Id.* Thus, the trial court dismissed Objectors' appeal for lack of standing.

Nevertheless, assuming Objectors had standing, the trial court proceeded to address the substantive issues raised by Objectors. The trial court stated that Objectors raised six issues concerning the Commission's approval of Applicant's

---

**2.** Former Sections 1601–B—1608–B of the Act of April 9, 1929, P.L. 343, added by Section 3 of the Act of October 9, 2009, P.L. 537, *as amended, formerly* 72 P.S. §§ 1601–B—1608–B. The Act of July 9, 2013, P.L. 270 repealed Article XVI–B and provided for a continuation of Article XVI–B with the addition of Article XIX–B (72 P.S. §§ 8901–B—8908–B).

development plans. The trial court considered and rejected each of Objectors' arguments, concluding the Commission adhered to the law and acted within its discretion in approving Applicant's development plans.

Objectors filed a notice of appeal to this Court, and the trial court ordered Objectors to file a concise statement of the errors complained of on appeal pursuant to Pa. R.A.P. 1925(b), which they did. The trial court then issued an opinion in support of its decision pursuant to Pa. R.A.P. 1925(a), in which it confirmed its earlier decision. Objectors' appeal is now before us for disposition.

## II.  Issues

On appeal,[3] Objectors first argue the trial court erred in determining they lacked standing to initiate an appeal from the Commission's decision. They also contend the Commission erred in approving Applicant's plans.[4]

## III.  Discussion

### A.  Objectors' Standing to Appeal Commission's Decision

Objectors first argue they have interests that will be adversely affected by the arena project. Initially, they point out the "arena plans" are titled "Allentown Arena and Events Center." Appellants' Br. at 9. The plans depict development of an area in the heart of the City, comprising several city blocks, including the streets separating those blocks and approximately 34 parcels. The site is bounded by Linden Street to the north, 7th Street to the east, Hamilton Street to the south and 8th Street to the west. The arena plans depict a building of 1,000,100 square feet, containing a professional sports arena, a ten-story hotel tower, a nine-story office tower and a seven-level parking garage tower, as well as expansive ancillary facilities. According to Objectors, the Allentown Arena and Events Center is easily the most significant proposed development in the City in many years.

Objectors assert Whitehall Manor and Atiyeh own an office leasehold interest in the Dime Bank Building, which is located within the bounds of the project. The building is shown on the plans as being preserved and incorporated into the project. However, the plans do not depict or acknowledge Whitehall Manor's leasehold interest, and do not address the preservation of the interests of Whitehall Manor and Atiyeh. They further contend Linden 515's property is in close proximity to the development. Objectors argue the development will have a far-reaching impact on the neighborhood and the entire City, but a very specific and immediate impact on Objectors' properties.

Relying on *Miravich v. Township of Exeter,* 6 A.3d 1076 (Pa.Cmwlth.2010), Objectors maintain that in matters involving land development approvals, there is no requirement that an aggrieved party attend or otherwise participate in the proceedings below in order to appeal an agen-

**3.** Where, as here, a trial court receives no additional evidence, its review is limited to determining whether the commission committed a manifest abuse of discretion or an error of law. *Kassouf v. Twp. of Scott,* 584 Pa. 219, 883 A.2d 463 (2005). Similarly, in general, where the trial court takes no additional evidence, the scope of appellate review in a land development appeal is limited to determining whether the local governing body committed an error of law or an abuse of discretion. *Robal Assocs., Inc. v. Bd. of Supervisors of Charlestown Twp.,* 999 A.2d 630 (Pa.Cmwlth.2010) (*en banc*); *Morris v. S. Coventry Twp. Bd. of Supervisors,* 836 A.2d 1015 (Pa.Cmwlth.2003).

**4.** The City of Allentown joins in Applicant's Brief.

cy decision granting approval. Nevertheless, Objectors' representative attended and spoke at the single meeting at which the plans were considered. Objectors assert they would have participated more fully had there been a process that remotely resembled the land development approval process that normally attends a development of the magnitude of that at issue here. Objectors argue they would, under normal circumstances, have a chance to review the plans for completeness and compliance with applicable ordinances. They would also normally have the ability to evaluate the response of the City's professional staff to the plans, set forth in review letters. Here, Objectors contend, the submission, review, and approval all took place within a matter of days. Plan approval, without significant public input, was clearly a *fait-accompli.*

Objectors assert the development of the arena will generate traffic congestion in an area with an already insufficient traffic network adversely impacting travel to and from Linden 515's property. It will impact parking. It will inevitably, fundamentally and irrevocably alter the character of the neighborhood, and will fiscally impact the neighborhood and City. Contrary to the findings of the trial court, Objectors argue, their interests are directly and immediately impacted by the proposed development, and they have standing to pursue the instant action. The development was rushed through the approval process without any opportunity for these impacts to be analyzed.

Objectors also argue the City and Applicant waived the right to challenge Objectors' standing to be parties to the approval proceedings below, and to bring an appeal, by failing to object to Objectors' participation as a party in the approval process. *See Thompson v. Zoning Hearing Bd. of Horsham Twp.,* 963 A.2d 622, 625 (Pa. Cmwlth.2009). Although *Thompson* involved proceedings before a zoning hearing board, rather than a land development application, Objectors contend, the rule applicable to raising objections or waiving the right to do so when an objector chooses to participate in the approval process, should apply here. Objectors argue that their participation in the proceedings below, coupled with the failure of the City or Applicant to object to that participation on the basis of lack of standing, should lead this Court to conclude that any standing argument is waived.

Pursuant to Section 1002–A (a) of the Pennsylvania Municipalities Planning Code [5] (MPC):

All appeals from all land use decisions rendered pursuant to Article IX[ [6]] shall be taken to the court of common pleas of the judicial district wherein the land is located and shall be filed within 30 days after entry of the decision as provided in

5. Act of July 31, 1968, P.L. 105. Section 1002–A was added by the Act of December 21, 1988, P.L. 1329, *as amended,* 53 P.S. § 11002–A.

6. Pursuant to Section 909.1(b)(2) of the MPC:
   (b) The governing body or ... the planning agency, if designated, shall have exclusive jurisdiction to hear and render final adjudications in the following matters:
   \* \* \* \*
   (2) All applications pursuant to section 508 for approval of subdivisions or land developments under Article V. Any provision in a subdivision and land development ordinance requiring that final action concerning subdivision and land development applications be taken by a planning agency rather than the governing body shall vest exclusive jurisdiction in the planning agency in lieu of the governing body for purposes of the provisions of this paragraph. Section 909.1 was added by the Act of December 21, 1988, P.L., 1329, *as amended,* 53 P.S. § 10909.1(b)(2).

42 Pa.C.S. § 5572 (relating to time of entry of order)....

53 P.S. § 11002–A. While Section 1002–A does not specifically state that a "person aggrieved" may initiate a land use appeal to a common pleas court, this Court previously explained:

> The MPC § 1002–A [53 P.S. § 11002–A] governs the filing of an appeal and that section no longer specifically requires that a protestant who wishes to contest a decision by ... a governing body which is favorable to a landowner be a 'person aggrieved.'
>
> However, according to Ryan, *Pennsylvania Zoning Laws and Practice,* Supplement, at § 9.5.5, p. 140,
>
>> ... *this should not result in a change in the law, for the 'person aggrieved' standard simply expresses the general rule that a person contesting a zoning determination have an interest in the matter sufficient to give him standing.*
>
> As such, [p]etitioners must be 'persons aggrieved' in order to have standing to initiate an appeal of the [b]oard of [s]upervisors' [d]ecision.

*Application of Rouse & Assocs. Ship Road Land Ltd. P'ship,* 161 Pa.Cmwlth. 52, 636 A.2d 231, 234–35 (1993) (footnote omitted) (emphasis added); *see also Leoni v. Whitpain Twp. Zoning Hearing Bd.,* 709 A.2d 999 (Pa.Cmwlth.1998).

Neither the MPC nor the Land Development and Subdivision Ordinance of the City of Allentown (SALDO)[7] define the term "person aggrieved." However, our Supreme Court explains:

> 'Aggrieved person' has acquired a particular meaning in the law. In *William Penn [Parking Garage, Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975) ], we explained that the core concept of standing was that a party had to be 'aggrieved.' 346 A.2d [at] 280–81. And, 'aggrieved' when used in terms of standing is generally understood to mean that the person 'has a substantial, direct and immediate interest in the claim sought to be litigated' as set forth in *William Penn. See, e.g., Hospital & Health System Ass'n of Penn. v. Dep't of Public Welfare,* 585 Pa. 106, 888 A.2d 601 (Pa.2005) (explaining that under *William Penn* 'where a person is not adversely affected in any way by the matter challenged, he is not aggrieved and thus has no standing to obtain a judicial resolution of that challenge.'); *Bergdoll v. Kane,* 557 Pa. 72, 731 A.2d 1261, 1269 (1999); *see also Sparacino v. Philadelphia Zoning Bd. of Adjustment,* 728 A.2d 445, 448 (Pa.Cmwlth.1999) (explaining that 2 Pa.C.S. § 752, which provides that 'any person aggrieved' by an adjudication of a local agency, means that the person must establish standing under *William Penn* )....

*Spahn v. Zoning Bd. of Adjustment,* 602 Pa. 83, 112–13, 977 A.2d 1132, 1149–50 (2009).

Further, in *Miravich,* this Court, speaking through (then-President) Judge Leadbetter stated:

> [S]tanding ... comprises two concepts. The first is substantive standing, which looks to whether the putative litigant has a sufficient interest in the outcome of the litigation to be allowed to participate. This facet of standing—whether one has an interest that is direct, imme-

---

**7.** The record does not contain a copy of the Land Development and Subdivision Ordinance of the City of Allentown (SALDO); however, a copy of the SALDO may be found at City of Allentown, Land Development and Subdivision, Adopted by City Council, Ordinance 12369, as amended, *available at http:// www.allentownpa.gov/Portals/0/files/legislative/ codified_ordinances/13-zoning/3subdivision. pdf.* (last visited September 18, 2013).

diate and substantial—is required at all levels of proceedings, and in the context of standing to appeal is generally described as whether one is 'aggrieved' by the decision sought to be reviewed. The other aspect of standing ... is procedural in nature, i.e., whether one has asserted his right to participate sufficiently early. This inquiry involves a balancing of the interests of judicial economy and those of due process. Objections must be stated in sufficient time that they can be heard without duplicative hearings, but not until potential objectors have sufficient notice of the proceedings that it is reasonable to expect them to assert their rights.

*Id.* at 1078. Additionally, in *Miravich,* after discussing the significant differences between the MPC provisions that govern hearings before zoning hearing boards and those that govern subdivision and land development proceedings, we stated (with emphasis added):

Against this background, it is clear why the rule requiring an appearance before the ZHB before a party is granted standing in a zoning appeal does not extend to appeals from subdivision and land development decisions. In the zoning context, there is a hearing preceded by notice, a formal definition of who can be a party at that hearing, a record and a mechanism for making a formal appearance. Thus, the rule that those who may wish to be parties to a subsequent appeal are required to appear at the ZHB hearing serves both judicial economy and is fair to all interested parties. *However, because similar procedural*

*protections are not required in subdivision and land development proceedings, it would be manifestly unfair, if not a denial of due process, to impose such a stringent rule as a prerequisite to subdivision and land development appeals.*

*Had the [b]oard [of supervisors] voluntarily followed the procedures required of a ZHB and provided notice and a hearing on the record with a clear procedure for entering an appearance, we would agree with common pleas that [p]rotestants were required to meet both the standards set out in Leoni in order assert their objections on appeal.* However, because the [b]oard [of supervisors] provided none of these procedural protections, we hold that the only applicable standing requirement is substantive, *i.e.,* whether [p]rotestants are "persons aggrieved." *See [In re Application of Rouse & Assocs.]* It is well-established that adjacent property owners have substantive standing to object to subdivision plans both before the governing body and in land use appeals to common pleas. *Id. ...*

*Miravich,* 6 A.3d at 1079–80. With regard to the procedures utilized by the Commission here,[8] a review of the certified record reveals the City published notice of the Commission meeting at which Applicant's plans were reviewed one week prior to the meeting, and the City posted the property more than one week prior to the meeting. Certified Record (C.R.) at Item #9. Additionally, the record contains a CD recording and a written transcription (albeit not stenographical) of the meeting at

---

8. Pursuant to Section 501 of the MPC:

The governing body of each municipality may regulate subdivisions and land development within the municipality by enacting a subdivision and land development ordinance. The ordinance shall require that all subdivision and land development plats of land situ-

ated within the municipality shall be submitted for approval to the governing body *or, in lieu thereof to a planning agency designated in the ordinance for this purpose, in which case any planning agency action shall be considered as action of the governing body....*
53 P.S. § 10501 (emphasis added).

which the Commission reviewed Applicant's plans. *Id.* There is no dispute the meeting was open to the public, and there is no indication that Objectors were precluded from presenting evidence or cross-examining witnesses. However, it does not appear the Commission utilized a clear procedure for entering an appearance. Thus, it does not appear that Objectors were required to demonstrate procedural standing here. *Miravich.*

■ At the Commission meeting, David Harte, who identified himself as "the Vice President of Land Development for Pennsylvania Venture Capital, Inc." stated he "represent[ed] an owner that is a related company that has a lease of office space in the Dime Bank building [which is located within the bounds of the project], so we are definitely affected by this project...." R.R. at 60a. Harte then raised several alleged deficiencies in Applicant's plans. Assuming Harte's appearance on behalf of Whitehall Manor was sufficient to confer *procedural* standing upon Whitehall Manor (or, alternatively, that Objectors were not required to establish procedural standing because this case involved a land development proceeding rather than a proceeding before a zoning board, *see Miravich*), Objectors were still required to show substantive standing, *i.e.*, that they possessed a substantial, direct and immediate interest.

■ "A 'substantial' interest is an interest in the outcome of the litigation which surpasses the common interest of all citizens in procuring obedience to the law." *S. Whitehall Twp. Police Serv. v. S. White-*

hall Twp., 521 Pa. 82, 86, 555 A.2d 793, 795 (1989). "A 'direct' interest requires a showing that the matter complained of caused harm to the party's interest." *Id.* at 86–87, 555 A.2d at 795. "An 'immediate interest' involves the nature of the causal connection between the action complained of and the injury to the party challenging it, and is shown where the interest the party seeks to protect is within the zone of interests sought to be protected by the statute or constitutional guarantee in question." *Id.* at 87, 555 A.2d at 795 (citations omitted).

■ In the zoning context, a property owner need not establish pecuniary or financial loss if his property is located in close proximity to the subject property because the zoning decision is presumed to have an effect on the property owner's property. *See Laughman v. Zoning Hearing Bd. of Newberry Twp.*, 964 A.2d 19 (Pa.Cmwlth.2009).[9]

In determining Objectors did not satisfy the "substantial-direct-immediate test" here, the trial court explained:

[Objectors] say they have standing because Whitehall [Manor] has an office leasehold interest in the Dime Bank Building which is located within the area to be developed under [Applicant's] development plan. [Objectors] concede that the development plan shows the Dime Bank Building as being preserved. However, they note that Whitehall [Manor] maintains a sign on the outside of the Dime Bank Building and the development plan does not specifically ad-

---

9. In *Laughman v. Zoning Hearing Board of Newberry Township*, 964 A.2d 19 (Pa.Cmwlth. 2009), we stated that property that is adjacent to or abuts the zoning area in question is in close proximity for standing purposes. Further, we acknowledged our prior holding that the owner of property within 400 to 600 feet of the challenged zoning district is also within close proximity and has standing. *Id.* However, the owners of property one-half mile and one mile or more away from the challenged zoning area have been deemed to not be in close proximity in order to confer standing on those challenging a change to the zoning ordinance or map. *Id.*

dress preservation of the sign. Further, [Objectors] note that the property owned by Linden [515] is in close proximity to the area affected by the development plan.

[Objectors] assert that

> [t]he development of the Arena will obviously have far reaching impacts on the downtown area of the City (of Allentown). It will generate traffic congestion in an area with an already insufficient traffic network adversely impacting travel to and from the Linden Property. It will impact parking. It will fundamentally and irrevocably alter the character of the neighborhood, and will fiscally impact the neighborhood and City.

(Appellants' brief, p. 5).

[Objectors] had the opportunity to develop an evidentiary record to support the claims described above yet declined to do so. Therefore, the court is restricted to analyzing [Objectors'] claims based on the record developed before the Commission. From a review of that record, there is nothing to indicate that [Objectors'] properties will be aggrieved by the implementation of the development plan.

[Objectors'] claims about Whitehall [Manor's] sign on the Dime Bank Building are undercut by [Objectors'] admission that the development plan includes preservation of that building in its current form. [Objectors] offer no evidence as to the location of the sign on the Dime [Bank] Building and offer no evidence as to how the development plan will adversely affect the sign. Also, the claims as to potential traffic and parking issues are unsupported by any evidence. [Objectors'] interests pertaining to traf-

fic and parking are not 'substantial' for purposes of the standing analysis because these concerns are not unique to [Objectors], but are 'abstract interests all citizens have in the outcome of the proceedings.' Finally, [Objectors] offer no evidence to support the general claim that the development plan will 'fundamentally and irrevocably alter the character of the neighborhood.' Thus, [Objectors] have failed to demonstrate that they possess standing to bring this appeal.

Tr. Ct., Slip Op., at 5–7. We disagree with the respected trial court's determination that Objectors lacked substantive standing to appeal the Commission's decision.

More specifically, at the Commission meeting, Harte, Whitehall Manor's representative, stated he "represent[ed] an owner that is a related company that has a lease of office space in the Dime Bank building [which is located within the bounds of the project], *so we are definitely affected by this project....*" R.R. at 60a (emphasis added).[10] Harte's statement was, on its face, satisfactory to show Whitehall Manor had a leasehold interest in a building located within the bounds of the project, which would usually be sufficient to confer standing upon Whitehall Manor. *Miravich* (adjacent property owners have substantive standing to object to subdivision plans both before the governing body and in land use appeals to common pleas courts); *Active Amusement Co. v. Zoning Bd. of Adjustment*, 84 Pa. Cmwlth. 538, 479 A.2d 697, 701 (1984) ("Just as the interest of a zoning applicant need not be founded upon a fee simple title, but can arise from equitable ownership *or from a lease, the interest of an*

---

**10.** In response to questioning by Applicant's counsel, Harte clarified that his client was, in fact, Whitehall Manor. R.R. at 63.

*objector is not dependent upon land ownership (as distinguished from possessory interest) in zoning, which is concerned with land use rather than land titles.")* (Emphasis added.) (Citation omitted.)

Further, Applicant raised no objection in response to Harte's statement concerning Whitehall Manor's leasehold interest. Moreover, Applicant declined the opportunity to ask for further details on aggrievement. As a result, Harte was not put on notice during the hearing before the factfinder that further information was required to establish standing.

Our decision on the standing issue is also supported by the procedural circumstances in this case. We refer in particular to the Commission's conditional approval of Applicant's preliminary and final land development plans for a major development in one step. In the absence of fair notice of a challenge to Harte's statement during the *only* hearing before the factfinder, we decline Applicant's invitation to second-guess the sufficiency of the assertion of standing later.[11]

### B. Commission's Approval of Applicant's Land Development Plans

Objectors next contend the approval process here was significantly flawed, hurried, and carried out in a manner that prevented Objectors' participation. They assert the review of the arena plans: was not thorough and comprehensive; was not carried out in accordance with applicable ordinances; and, did not establish the project as proposed conforms to applicable ordinances. Objectors argue waivers of relevant and applicable SALDO provisions

were granted despite the fact there was no hardship to justify the grant of waivers.

Objectors further maintain the project unlawfully proposed the construction of buildings over streets and the obstruction and elimination of streets the developer did not own, and which were not vacated by the City. They argue the plans were incomplete and not accompanied by required studies. Objectors also contend the approval process was flawed in that the City, the Commission and the developer are all essentially agents of the City, and it was in the interest of all of them to assure the project was speedily approved without public participation or an opportunity to inspect plans or fully develop an understanding of the arena plans and their far-reaching impacts.

While Objectors' brief raises numerous merits issues and sub-issues, most of these issues were not addressed by Objectors' counsel at oral argument before this Court. Rather, Objectors' counsel only addressed the issue regarding the vacation of streets set forth in sub-issue 1, below. Nevertheless, because Objectors raised all of the issues below in their brief, we address all of these issues.

### 1. Applicant's Standing to Submit Land Development Application

■ Objectors maintain the Commission erred in approving the land development application and arena plans where Applicant lacked standing to file the application. Specifically, Objectors assert, at the time of the approval of the plans, Applicant did

---

11. The Commission, not the trial court, was the fact-finder. While Objectors could have asked the trial court to receive additional evidence, it is unclear whether Applicant would have consented to such a procedure. It is also uncertain whether the trial court would have received additional evidence itself

(thereby becoming the fact-finder, with additional responsibilities) or would have remanded the matter to the Commission. Therefore, in this case the failure of Objectors to request to *submit additional evidence* to the trial court is an ambiguous circumstance at best.

not own or have the right to develop the beds of six existing public City streets within the land area on which the project is proposed to be developed.

Objectors note the SALDO defines a "Developer" as "[a]ny landowner, agent of such landowner, or tenant with the permission of such landowner, who makes or causes to be made a subdivision of land or a land development." Section 1373.02 of the SALDO. Objectors assert the project qualifies as a "Land Development" and Applicant is the "Developer." Sections 1373.02(14), (26) of the SALDO. However, Applicant does not own the streets; could not lease the streets; and could not have obtained the street owner's permission to close and redevelop those streets. At the time of the approval, those streets were open and dedicated to public use, and could not have been lawfully removed from pubic use, vacated, given away, leased, or sold without formal action of the City. Objectors argue the City took no such action. Because Applicant did not own or have a valid proprietary interest in all of the land within the area shown on the plans, Objectors assert, the approval is void.

Section 1373.02(14) of the SALDO defines a "Developer" as "[a]ny landowner, agent of such landowner, or tenant with the permission of such landowner, who makes or causes to be made a subdivision of land or a land development."

There is no dispute that, at the time Applicant submitted its plans, it owned 33 of the 34 lots to be developed. Further, by letter dated February 14, 2012, the remaining lot owner, Hamilton Street Associates appointed Applicant as its agent

for development purposes. Supplemental Reproduced Record (S.R.R.) at 1b.

With regard to the streets within the proposed development area, the Commission conditioned approval of Applicant's plans on the vacation of the streets, and Applicant accepted that condition. C.R., Item # 9; Reproduced Record (R.R.) at 10a, S.R.R. at 7b (Engineering Section, Comment 7). Both the MPC and the SALDO envision approval of a preliminary or final land development plan with conditions, subject to an applicant's acceptance of such conditions. Section 503(9) of the MPC, 53 P.S. § 10503(9); Sections 1375.03(J), 1375.04(D) of the SALDO; *Graham v. Zoning Hearing Bd. of U. Allen Twp.*, 520 Pa. 526, 555 A.2d 79 (1989) (MPC authorizes governing body to place conditions on the approval of either preliminary or final plan with applicant's acceptance).

Here, the process of vacating the streets involved an entity other than the Commission, and was commenced prior to Applicant's submission of its preliminary and final land development plans. R.R. at 64a. To that end, Allentown City Council, not the Commission, had authority to vacate the streets,[12] and, in fact, did so by ordinance dated February 1, 2012, which was signed by the Mayor shortly after the Commission approved Applicant's plans. *See* C.R., Item #.9 (April 9, 2012 e-mail from Tawanna Whitehead to Michael Hefele and Michael Hanlonre: Street vacation, attaching Ordinance # 14974). No error is apparent in the Commission's decision to condition approval of Applicant's plans on the vacation of streets given that the process was commenced prior to Applicant's submission of its plans, and approval

---

12. *See* Section 915.01 of the Codified Ordinances of Allentown, Pennsylvania, 1962 (relating to Street Vacations), *available at http:// www.allentownpa.gov/Portals/0/files/legislative/* *codified_ordinances/9-streetswatersewer/1street andsidewalks.pdf.* (last visited September 18, 2013).

by an entity other than the Commission was necessary. *Cf. Kohr v. L. Windsor Twp. Bd. of Supervisors*, 910 A.2d 152 (Pa.Cmwlth.2006) (where permits from an agency outside the municipality are required for a land development proposal, approving the proposal with the condition that outside agency permits are received is appropriate); *Morris v. S. Coventry Twp. Bd. of Supervisors*, 836 A.2d 1015, 1025 (Pa.Cmwlth.2003) ("[C]ourts have long held that, where an outside agency's approval is required, the municipality should condition final approval upon obtaining a permit, rather than denying preliminary approval of the land development application.")

In addition, our Supreme Court cautions that when assessing the propriety of conditional approval, the practicalities of the situation must be considered. *See Broussard v. Zoning Board of Adjustment of City of Pittsburgh*, 589 Pa. 71, 907 A.2d 494 (2006) (grant of special exception with conditions where applicant demonstrated willingness and ability to satisfy conditions and where it was reasonable that approval precede formal execution of binding contract for off-site parking). In this case, it was reasonable that approval of the land development application precede formal vacation of streets being used by the public in downtown Allentown.

## 2. Alleged Procedural Flaws in the Review Process

Objectors next argue that, prior to the Commission's meeting to consider the plans, Objectors' representatives filed Right–to–Know Law [13] requests asking for any and all information regarding the proposed arena. The City did not provide information responsive to the request in a timely manner, but rather invoked its right to delay production for 30 days on the basis that the requested materials were voluminous. The City finally turned over those materials the day before the Commission meeting. On that date, Objectors obtained a copy of a three-page letter, dated March 7, 2012, from the City's Director of Planning to Applicant, commenting on the plans. *See* R.R. at 27a. Also, on March 12, the City's Director of Planning issued a second letter to Applicant, consisting of two pages of comments. R.R. at 28a. Objectors assert these are the only review letters concerning the plans. They argue it appears there is no review letter from the City's Engineer. Objectors contend they had less than one day before the Commission's meeting at which the plans were approved to examine the arena plans and review letters.

Further, as to the substance of the review letters, Objectors contend, the reviews performed are not the sort of reviews normally expected in a project of this magnitude. Objectors contend the "paltry" review letters would suggest the plans, as submitted, are very close to compliant with all applicable ordinances. Appellants' Br. at 13. Objectors argue this is almost never the case, even with the simplest of projects.

Objectors also note that at the Commission meeting, a member of the Commission, Oldrich Foucek, III, Esq., recused himself from the proceedings, got up from his seat, and took a seat at Applicant's table, with members of his law firm representing Applicant. Objectors argue Applicant, the City, and the Commission all decided to agree the plans were nearly perfect and there was no need for a meaningful review by a disinterested engineer, a neutral planner, or an engineer charged with bearing the public interest in mind. The City, the Commission and the City

13. Act of February 14, 2008, P.L. 6, 65 P.S. §§ 67.101–67.3104.

agency-Applicant then completed the review and approval process at lightning speed. Under these circumstances, Objectors and other interested parties were effectively deprived of the ability to question the plans.

Objectors contend under normal circumstances the issues raised by Objectors' representative at the Commission meeting—the fact that the footprint of the building is "approximate"; the fact that the uses are not identified on the plan and were as of that time partially unknown; traffic impacts; and, the fact that the developer did not yet own portions of the subject property—would not have been treated dismissively. R.R. at 29a.

Despite their general criticisms of the review process, Objectors cite no specific MPC or SALDO provision that the Commission allegedly violated in reviewing and approving Applicant's plans. As this Court recognized in *Miravich,* "the MPC places virtually no procedural requirements on a [local governing body] considering subdivisions and land development proposals." In fact, the MPC itself makes clear that public hearings are not required. *Id.* at 1079 (citing Section 508(5) of the MPC, 53 P.S. § 10508(5)).

Further, a review of the SALDO's procedural requirements for review and approval of preliminary and final land development plans, *see* Sections 1375.03(A)–(E), (G), 1375.04(A)–(D) of the SALDO, reveals the review process complied with these requirements. Most notably, consistent with the SALDO, and as set forth above, the City provided public notice of the Commission's meeting to consider the plans and posted the property. C.R., Item # 9; *see* Section 1375.03(D) of the SALDO.

Also, with regard to Objectors' contention about its Right–to–Know request, when Objectors' representative raised this issue at the Commission meeting, Appli-

cant's counsel clarified that Objectors' request related to an earlier submission by Applicant (which is not presently before us). R.R. at 65a. Objectors' representative did not take issue with this statement. *Id.*

In addition, the City's Director of Planning issued two review letters on Applicant's plans, which contain comments from various City departments, including engineering, planning, traffic, parks and zoning. S.R.R. at 4b–6b, 7b–8b. The certified record also contains comprehensive traffic and parking analyses. C.R., Item # 9.

Further, while Objectors' representative made several statements regarding the plans before the Commission, Objectors presented no evidence beyond these statements.

In addition, Objectors take issue with the fact that Attorney Foucek, one of the Commission's members, recused himself at the meeting and took a seat at Applicant's table with members of his law firm representing Applicant. However, the transcript of the meeting reveals that Attorney Timothy J. Siegfried represented Applicant throughout the Commission meeting. Further, Attorney Foucek recused himself at the outset of the meeting. R.R. at 40a. Objectors do not assert he had any further involvement on Applicant's behalf at the meeting.

### 3. Simultaneous Approval of Preliminary/Final Land Development Plans

■ Objectors next maintain the Commission exceeded its authority by concurrently granting preliminary and final land development approval where the SALDO did not authorize the Commission to do so. Rather, the SALDO specifies two distinct application procedures, providing different

submission and review processes for preliminary and final land development plans. Section 1375.04(A) states that, "[u]pon completion of modifications required by any outstanding requirements of the Planning Commission or applicable City staff, the developer may apply for approval of the Final Plan."

Unlike a preliminary plan, Objectors assert, a final plan shall be accompanied by proof that all outstanding issues are resolved, and, here, several unresolved issues existed. Objectors also contend that when a final plan is submitted, the SALDO states the plan "shall" be placed on the agenda of the Joint Planning Commission of Lehigh and Northampton Counties, in addition to that of the Commission. Section 1375.04(C) of the SALDO. As a result of granting preliminary and final plan approval in one step, these steps in the approval process were completely bypassed.

Objectors also contend Applicant was not entitled to a waiver of the requirement for submission of separate preliminary and final development plans. *See* Section 1371.08 of the SALDO. Objectors maintain there is no hardship here that would preclude separate submissions. On that basis alone, no waiver should have been granted. Moreover, Objectors argue, the grant of a waiver undermines and nullifies the intent and purpose of the SALDO, and on that basis as well the waiver should have been denied. *See* Section 1371.03 of the SALDO.

Objectors argue in the context of the approval of a development in excess of a million square feet, comprising more than five acres, at a prominent location in the City, the merger of the preliminary and final approval processes into a single process, which involved minimal review, minimal notice and minimal opportunity for public scrutiny and involvement, constitutes an abuse of discretion.

The Commission granted Applicant's written request for a waiver from the requirement in Section 1375.04(A) that, "[u]pon completion of modifications required by any outstanding requirements of the Planning Commission or applicable City staff, the developer may apply for approval of the Final Plan." *Id.* Through its request, Applicant sought permission to obtain preliminary and final land development approval simultaneously. As Objectors point out, and Applicant acknowledges, the SALDO generally contemplates a two-step process for land development approval. However, Objectors cite no SALDO provision that prohibits concurrent approval of a preliminary and final land development plan; [14] thus, it appears Applicant's waiver request may have been cautionary and superfluous. R.R. at 41a (statement by Applicant's counsel at the Commission meeting, "A hyper-technical reading of your SALDO could be construed that one would have to address all of the preliminary plan comments before even be [sic] permitted to file a final plan.").

To that end, in his treatise Pennsylvania Zoning Law and Practice, author Robert S. Ryan observes:

As its name indicates, an application for 'final' approval represents the completion of the approval process. Generally it involves submission of plans corrected to meet conditions imposed by

---

14. It is noteworthy, however, that *after* the Commission's approval of Applicant's plans, the City amended the SALDO to specifically authorize an applicant to submit a combined application for preliminary/final approval.

*See* Section 1375.01(A)(1) of the SALDO. In such cases, the application is reviewed pursuant to both the preliminary and final plan requirements in the SALDO.

the preliminary approval, and the preparation of additional plans where required under the terms of that approval. *While some subdivision ordinances are drafted in terms which seem to require that a preliminary application precede an application for final approval, it is not at all clear that a municipality could reject a complete and conforming application for final approval simply because a preliminary application had not been filed.*

* * * *

The [MPC] envisions both preliminary and final approval of subdivision plans. *That is not to say that a municipality may refuse to entertain an application seeking both preliminary and final approval of a subdivision plan which complies in all respects with the applicable ordinances,* but only that the municipality may establish procedures under which the normal sequence is the filing of a preliminary application, a decision on that application involving the imposition of conditions which must be satisfied prior to final approval, and, eventually, the filing of an application for final approval of the subdivision or land development.

Robert S. Ryan, PENNSYLVANIA ZONING LAW AND PRACTICE §§ 11.2.1, 11.2.3 (2007 ed.) (Emphasis added) (Citations omitted).

Nevertheless, as to the merits of the grant of the waiver, the SALDO states: "Where it is found that unique physical conditions are creating undue hardship, the Planning Commission may vary these regulations so that substantial justice may be done and the public interest secured;

provided that such variation will not have the effect of nullifying the intent and purpose of these regulations." Section 1371.08(A) of the SALDO (emphasis added).[15]

Further, this Court previously observed:

[T]he power to grant [SALDO] waivers resides with the supervisors, who may relax [SALDO] standards upon proof less rigorous than that required in order to obtain a variance from the [z]oning [h]earing [b]oard. *See Valenti [v. Washington Twp.,* 737 A.2d 346, 349 (Pa. Cmwlth.1999) ] ('township may grant waivers which it deems appropriate in the interests of the township'). *See also* [*Morris* ].

*Telvil Constr. Corp. v. Zoning Hearing Bd. of E. Pikeland Twp.,* 896 A.2d 651, 656 (Pa.Cmwlth.2006) (footnote omitted). "Moreover, we have held that a waiver is proper where an additional requirement would offer little or no additional benefit and where literal enforcement would frustrate the effect of improvements." *Tioga Pres. Grp. v. Tioga Cnty. Planning Comm'n,* 970 A.2d 1200, 1205 (Pa.Cmwlth. 2009); *see also Monroe Meadows Housing P'ship, LP v. Mun. Council of Municipality of Monroeville,* 926 A.2d 548, 553 (Pa. Cmwlth.2007) ("a waiver [is] proper where a development offers a substantial equivalent to a subdivision requirement, where an additional requirement would offer little or no additional benefit, and where literal enforcement of a requirement would frustrate the effect of improvements."); *see also Levin v. Twp. of Radnor,* 681 A.2d 860 (Pa.Cmwlth.1996). Also, "[i]t is well

---

**15.** Section 503(8) of the MPC states that a subdivision and land development ordinance may include, among other things, "[p]rovisions for administering waivers or modifications to the minimum standards of the ordinance in accordance with section 512.1, when the literal compliance with mandatory provisions is shown to the satisfaction of the governing body or planning agency, where applicable, to be unreasonable, to cause undue hardship, or when an alternative standard can be demonstrated to provide equal or better results." 53 P.S. § 10503(8).

settled that, in the case where a developer cannot meet all the conditions of the subdivision ordinance, a township may grant waivers which it deems appropriate in the interest of the township." *Valenti,* 737 A.2d at 349.

Here, in requesting a waiver to allow for concurrent submission of its preliminary and final land development plans, Applicant indicated the Commission had few comments on the plans, and those comments could easily be addressed at one time. R.R. at 41a; *see also* S.R.R. at 2b–3b. The Commission granted the waiver, R.R. at 10a, and Objectors do not persuasively explain how the Commission's decision to forego a bifurcated preliminary and final plan approval process constitutes an abuse of discretion. Further, Objectors generally assert the grant of the requested waiver is contrary to the purposes of the SALDO. However, they offer no specific explanation as to how the Commission's decision to consider Applicant's preliminary and final land development plans simultaneously would "have the effect of nullifying the intent and purpose of [the SALDO]." Section 1371.08(A) of the SALDO.

In addition, contrary to Objectors' assertions, Applicant's plans were, in fact, submitted to the Lehigh Valley Planning Commission (the Joint Planning Commission of Lehigh and Northampton Counties) for comment. *See* Section 1375.04(C) of the SALDO; S.R.R. at 9b–11b (March 12 and March 29, 2012 correspondence from Lehigh Valley Planning Commission to City Planning Director regarding review of Applicant's plans).

### 4. Alleged Failure of Applicant's Plans to Conform to the SALDO

Finally, Objectors contend the Commission erred in approving the plans where they did not include information and details specifically required to be provided.

In a little over a page of their brief, Objectors point to numerous alleged deficiencies in Applicant's plans. In particular, they argue Applicant did not submit a lot consolidation plan as required by Sections 1377.02 and 1377.03 of the SALDO. They also maintain Applicant did not establish compliance with other SALDO requirements, including: providing the names and addresses of all of the record owners of the many tracts comprising the project, *see* Sections 1377.02(B)(1)(b) and 1377.03(B)(1)(b) of the SALDO; failing to provide complete development design information, *see* Sections 1377.02.B.3 and 1377.03.B.3 of the SALDO; failing to provide the location, size, and invert elevations of all sanitary and/or storm sewers and location of all manholes, inlets, and catchbasins, other appurtenances and detention facilities, *see* Section 1377.03(B)(3)(j) of the SALDO; failing to submit complete "final form" engineering drawings, *see* Section 1377.03(B)(4) of the SALDO; failing to submit utility plan and profile drawings, *see* Section 1377.03(A) of the SALDO; and, failing to propose adequate methods for development of the proposed improvements, *see* Section 1379.01(C) of the SALDO, where the Preliminary Geotechnical Engineering Study prepared by Langan Engineering and Environmental Services, dated July 8, 2011 states: "[b]asically, the karstic nature of the underlying soil and bedrock formations was the root cause [of the prior 'massive sinkhole'] and these conditions must be heavily considered in the redevelopment of this site and in particular the selection of the foundation system." Appellants' Br. at 19.

First, with regard to the lot consolidation plan, the Commission granted final approval of Applicant's plan conditioned on

the filing of a lot consolidation plan, and Applicant accepted that condition. C.R., Item # 9, R.R. at 10a; S.R.R. at 7b (Engineering Section, Comments 5, 6) ("Sheet C3 shall be recorded and title shall include deed of consolidation plan." "Each interior line to be removed shall be labeled to be deleted on Sheet C3.") As noted above, both the MPC and the SALDO allow approval of a preliminary or final land development plan with conditions, subject to an applicant's acceptance of such conditions. Section 503(9) of the MPC, 53 P.S. § 10503(9); Section 1375.04(D) of the SALDO; *Graham.* Objectors offer no explanation as to why conditional approval was improper in this regard.

Next, as to the names and addresses of the record owners of the tracts comprising the project, Applicant owns 33 of the 34 tracts that comprise the development, and Applicant's plans do, in fact, list Applicant as the owner of record as well as Applicant's address. C.R., Item # 9 (Preliminary/Final Land Development Site Plan at Sheet C–2). Further, as explained above, the remaining lot owner, Hamilton Street Associates, appointed Applicant as its agent for development purposes, S.R.R. at 1b, and Applicant's plans list the name and address of Hamilton Street Associates. C.R., Item # 9 (Preliminary/Final Land Development Site Plan at Sheet C–3).

Objectors also claim Applicant failed to provide complete development design information in accordance with Sections 1377.02(B)(3) and 1377.03(B)(3) of the SALDO. A review of the cited sections discloses that they set forth 8 and 18 detailed categories of information, respectively. *Id.* Objectors offer no explanation or analysis of which of the 26 categories of development design information are not shown on the 18 pages of plans. In the absence of further explanation on this point, we deem Objectors' vague assertion

waived. *See Hoffman v. Borough of Macungie,* 63 A.3d 461 (Pa.Cmwlth.) (*en banc* ), *appeal denied,* —— Pa. ——, 70 A.3d 812 (No. 98 MAL 2013, filed July 18, 2013) (issue deemed waived when party fails to properly explain or develop it in his brief); *Commonwealth v. TAP Pharm., Inc.,* 36 A.3d 1197, 1273 (Pa.Cmwlth.2011) ("While issue-spotting is great sport, without more it is wholly insufficient in a case of this complexity to preserve an issue for judicial review.")

Objectors next assert Applicant's plans are deficient because they do not provide sufficient information regarding sanitary and/or storm sewers and the location of all manholes, inlets and catchbasins, other appurtenances and detention facilities. *See* Section 1377.03(B)(3)(j) of the SALDO. Objectors fail to acknowledge that this Section of the SALDO actually states that the above information must be shown on the design scheme when required by the City Engineer. *Id.* They do not assert the City Engineer required this information here. In any event, a review of Applicant's plans reveals they do, in fact, contain information regarding existing features, utilities, storm sewer details and sanitary sewer details. C.R., Item . # 9 (Preliminary/Final Land Development Plan Site Plan at Sheets C–4 (Existing Features and Removals.Plan), C–6 (Utility Plan), C–16 (Storm Sewer Details) and C–17 (Sanitary Sewer Details)). In the absence of further explanation by Objectors, it is unclear what specific omissions they are referencing.

With regard to Objectors' contention that the plans do not include complete "final form" engineering drawings as contemplated by Section 1377.03(B)(4) of the SALDO, the Commission conditioned its approval of Applicant's plans as follows: "Upon completion of addressing all outstanding comments and at the time of

mylar signature by the City Engineer, provide three complete sets of signed and sealed land development plans stamped 'FOR CONSTRUCTION' for the Engineering Department's use." S.R.R. at 7b. Objectors offer no explanation as to why conditional approval was improper in this regard.

As to Objectors' arguments that Applicant did not include the required utility plan and profile drawings, see Section 1377.03(A) of the SALDO, a review of Applicant's plans reveals Applicant did, in fact, submit a utility plan and profile plans. C.R., Item #9 (Preliminary/Final Land Development Plan Site Plan at Sheets C–6 (Utility Plan) and C–7, C–8 (Plan and Profiles)). Additionally, the Commission granted approval of the plans conditioned on Applicant's submission of additional utility information. R.R. at 10a; S.R.R. at 7b (Engineering Section, Comments 3 and 4). Objectors offer no explanation as to why conditional approval based on the submission of additional information was improper.

Finally, Objectors claim Applicant failed to propose adequate methods for development of the proposed improvements where the Preliminary Geotechnical Engineering Study prepared by Langan Engineering and Environmental Services, dated July 8, 2011, states: "[b]asically, the karstic nature of the underlying soil and bedrock formations was the root cause [of the prior 'massive sinkhole'] and these conditions must be heavily considered in the redevelopment of this site and in particular the selection of the foundation system." Appellants' Br. at 19.

Section 1379.01(C) of the SALDO, cited by Objectors, states:

> Land which the City finds to be unsuitable for development due to flooding, improper drainage, steep slopes, rock formations, adverse earth formations or topography, utility easements, or other features which will reasonably be harmful to the safety, health, and general welfare of the present or future inhabitants of the development or its surrounding areas, *shall not be developed unless adequate methods are formulated by the developer and approved by the Planning Commission, upon recommendation of applicable reviewing agencies to solve the problems created by the unsuitable land conditions.* Such land shall otherwise be set aside for uses as shall not involve such a danger.

*Id.* Here, Objectors point to no finding by the City that the land at issue was unsuitable for development based on geologic conditions. In the absence of such a finding, the restriction on development in Section 1379.01(C) is, by its terms, inapplicable. Perhaps more importantly, Objectors point to no record evidence that indicates the land on which Applicant proposed to construct its development is unsuitable based on geologic concerns. Indeed, despite quoting from the July 2011 study performed by Langan Engineering, Objectors provide no record citation for this study.

## IV. Conclusion

In sum, we disagree with the respected trial court's determination that Objectors lacked standing to appeal the Commission's decision. However, we agree with the trial court that no error is apparent in the Commission's decision to conditionally approve Applicant's preliminary and final land development plans. Accordingly, we affirm.

## ORDER

**AND NOW**, this 30th day of October, 2013, the order of the Court of Common Pleas of Lehigh County is **AFFIRMED.**

CONCURRING AND DISSENTING OPINION BY Judge McCULLOUGH.

I agree with the Majority that Whitehall Manor, Inc. and Linden 515, LP (Appellants) have standing to object to the decision of the City of Allentown Planning Commission (Commission) that granted conditional approval of the preliminary and final land development plans submitted by Allentown Commercial and Industrial Development Authority (Applicant). However, I respectfully dissent from the Majority's decision to affirm the trial court's determination that the Commission did not err by simultaneously granting approval of Applicant's preliminary and final development plan. Specifically, I disagree for the following reasons:

1. Per section 1375.04(A) of the Land Development and Subdivision Ordinance of the City of Allentown (SALDO), a developer may apply for approval of its final plan "[u]pon completion of modifications required by any outstanding requirements of the [Commission]."

2. Applicant sought waiver from section 1375.04(A) pursuant to section 1371.08 of the SALDO.

3. However, section 1371.08 pertains to "unique physical conditions" that "are creating undue hardship." This provision does not provide a basis for Applicant to avoid the two-stage land development process and then, upon completion of the conditions of preliminary approval, apply for final approval. Section 1371.08 pertains to waivers based upon the physical characteristics of the property, and is not a means by which to avoid the procedural requirements of the SALDO.

4. That the SALDO contemplates a two-stage or bifurcating land development process is further evidenced by the fact that the City of Allentown felt compelled to amend the SALDO *after* the Commission approved Applicant's plans to specifically authorize an applicant to submit a combined application. This revision would not have been necessary had the SALDO permitted combined applications at the time the Commission approved Applicant's plans.

5. The Majority asserts that, notwithstanding the provisions of the SALDO, Applicant's waiver request "may have been cautionary and superfluous," and cites Ryan's treatise, *Pennsylvania Zoning Law and Practice* §§ 11.21–.23 (2007 ed.), and this Court's decision in *Valenti v. Washington Township*, 737 A.2d 346 (Pa.Cmwlth.1999), in support of this assertion. The Majority's reliance on both is misplaced.

In his treatise, Ryan observes only that "it is not at all clear that a municipality could reject a complete and conforming final application simply because a preliminary application had not been filed." Hence, Ryan's observation does not dispense with the need for final approval; rather, it merely suggests that seeking separate preliminary approval for "a complete and conforming final application" would be an unnecessary surplusage. This Court's decision in *Valenti* is of a vein similar to Ryan. In that case, we held that the developer was not required under the provisions of the applicable SALDO to submit a "sketch plan" as a prelude to submitting a "preliminary plan" as the first step in the approval process. By so holding, this Court did nothing more than apply the clear language of the SALDO in effect at the time of filing, which permitted the developers to submit either a sketch plan or a preliminary plan to initiate the approval process. In so doing, we distinguished the provisions of the SALDO as

subsequently amended, which specifically required the submission of a sketch plan.[1]

Here, it is obvious from the record that Applicant's plan was not final, rendering the need to go through a separate preliminary approval process unnecessary or a "hardship." Applicant sought a waiver that "all modification required by any outstanding requirements of the [Commission] or applicable City staff be completed prior to the time that the developer may apply for approval of a final plan." R.R. at 39a. It is obvious by seeking such a waiver, Applicant sought to avoid the final approval process by means of a preliminary plan that is subject to modification. Whatever support Ryan's treatise and the *Valenti* decision can lend to the notion that a municipality may combine preliminary and final approval when it is in receipt of a "complete and conforming" final plan, these authorities do not justify jettisoning the final approval process where, as here, there are modifications to be made to a major urban land development of five acres, including a one-million square-foot arena.

A bifurcated land development process serves an important function—increased public notice and hence the potential for increased public participation in the land development process. Thus, bifurcation is an important public check and balance on developers, developments and local governments to help ensure that the purposes of the Pennsylvania Municipalities Planning Code are met, i.e., "to accomplish coordinated development; to provide for the general welfare by guiding and protecting ... social and cultural facilities, development and growth...."[2]

Removing these checks and balances can shortstop public participation in such a large scale development by blurring the line between preliminary and final approval and sanctioning final approval for an incomplete development that bypassed the preliminary process and which is still subject to modification.

Recently, in *Shaw v. Township of Upper St. Clair Zoning Hearing Board*, 71 A.3d 1103 (Pa.Cmwlth.2013), a panel of this Court employed a substance over form analysis to strike down a municipal ordinance it determined to be a zoning map change masquerading as a text amendment, an important distinction because of the reduced notice provided to the public by virtue of a text amendment. In essence, that decision curtailed the ability of developers and local governments to restrict public input with respect to zoning changes.

Inapposite here, the Majority, by dispensing with the bifurcated process and approving a combined "final" plan for a major arena development prior to resolution of the required modifications, restricts public input. It is difficult to reconcile these conflicting land use directives.

Accordingly, I respectfully dissent from the Majority's affirmance of the Commission's waiver of the bifurcation approval process, and I would vacate that approval and remand this matter to the Commission for further proceedings.

---

1. It is also noteworthy that the amended SALDO in *Valenti* contained the following provision: "A plan showing all the information required for a final plan may be submitted as a preliminary plan *and, in the case where no changes to the plan are required by the Board,*

*may be approved as a final plan." Valenti,* 737 A.2d at 349–50 n. 8 (emphasis added).

2. Section 105 of the Pennsylvania Municipalities Code, Act of July 31, 1968, P.L. 805, *as amended,* 53 P.S. § 10105.